Electronically Filed
Intermediate Court of Appeals
CAAP-12-0000917
30-SEP-2013
12:06 PM

CAAP-12-0000917

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

IN THE INTEREST OF K CHILDREN

APPEAL FROM THE FAMILY COURT OF THE THIRD CIRCUIT
(FC-S NO. 05-0052)

MEMORANDUM OPINION
(By: Nakamura, C.J., and Foley and Reifurth, JJ.)

The Family Court of the Third Circuit (Family Court)[1] terminated the parental rights of Mother-Appellant (Mother) over her children, AK and MK (Children), pursuant to the "Findings of Fact, Conclusions of Law and Order Granting Motion to Terminate Parental Rights" (Order Terminating Parental Rights) filed on October 18, 2012. On appeal, Mother argues that the Family Court erred in terminating Mother's parental rights. In particular, Mother contends that the Family Court: (1) erred in determining that Mother could not provide a safe family home; (2) erred in determining that the permanent plans were in the best interests of Children; (3) violated Mother's due process rights "by requiring that she either take potentially dangerous psychotropic drugs or permanently lose her Children"; and (4) erred in failing to appoint a guardian ad litem for Mother. We affirm.

---

[1] The Honorable Lloyd Van De Car presided.

BACKGROUND

Mother has a long history of mental illness.  In May 2005, the Department of Human Services (DHS) removed Children from Mother's custody after receiving reports of Mother's deteriorating mental condition.  Mother was reportedly hallucinating, speaking to her mother, who was in Arizona, as if she were present in the room, and yelling and screaming at other tenants in Mother's apartment complex.  A neighbor stated that Mother yells, screams, and swears at people outside the apartment building several times each day, sometimes continuing for an hour.  This behavior led to frequent calls to the police and caused the landlord to eventually evict Mother.

AK told a DHS social worker that Mother yelled and talked to people who were not there, sometimes for hours at a time.  AK said that Children were worried and scared by Mother's behavior and hid in the bedroom closet or under the bed.  Mother also began speaking with what was described as a "Rastafarian accent," which she had developed within the last three years.  In 2005, Mother had a third minor child, JN, who was apparently in Mother's care and custody.  Mother thought that JN was present in her home, even though his whereabouts were unknown and he had not been living with her for weeks.  In June 2005, Mother agreed to temporary foster custody of Children and JN, after JN was located.

Mother was diagnosed at various times between 2005 and 2012 as suffering from psychosis; psychosis and schizophrenia, paranoid type; post-traumatic stress disorder, crystal methamphetamine induced psychosis (resolving), and paranoid personality disorder; psychotic disorder not otherwise specified; schizophrenic disorder; psychotic disorder not otherwise specified; organic mental disorder secondary to polysubstance abuse; and schizophrenia, paranoid type, and alcohol/poly substance abuse.  Mother also admitted to a history of using marijuana, crystal methamphetamine, cocaine, and alcohol.

2

Although not all of the mental health professionals who diagnosed Mother recommended that she take anti-psychotic medication to treat and control her psychotic symptoms, many of them did. Mother, however, refused to take any medication to address her mental health condition. Between 2005 and 2012, Mother's mental health problems remained unresolved, and she continued to exhibit, delusional, confrontational, and erratic behavior.

Despite Mother's mental health issues, the DHS made efforts to reunify Mother with Children, including permitting visits with Children. Although there were periods during which the visits were positive and successful, Mother's erratic and confrontational behavior attributable to her mental illness, and its effect on Children, resulted in suspensions or restrictions on Mother's visitation. Eventually, MK refused to visit with Mother, and Children both consented to their respective permanent plans, which called for the termination of Mother's parental rights.

In the meantime, the DHS again referred Mother for a psychiatric evaluation in 2009. Henry H. Yang, M.D. (Dr. Yang), who performed the evaluation, noted that Mother had grandiose delusions and admitted to auditory hallucinations, and he diagnosed Mother as having organic mental disorder secondary to polysubstance abuse. Dr. Yang opined that Mother suffered from a disabling mental disorder, which rendered her unable to make rational decisions necessary to function as a responsible and supportive parent. Dr. Yang opined that Mother would benefit from anti-psychotic medications such as Risperdal or Geodon to relieve her symptoms of psychosis. However, because Dr. Yang did not believe that Mother posed an imminent danger to herself or others, he noted that "it would be up to [Mother]" to comply with recommendations to take such medications. Dr. Yang recommended that if Mother sought to regain custody of Children, medication management with psychotropic medications should be required. He also recommended that Mother be evaluated to see if her mental

3

condition improved in response to the medications, to the point where she could be a responsible parent.

In December 2009, the DHS proposed a service plan that explicitly required Mother to engage in medication management that would include the provision of psychiatric medications as recommended by Dr. Yang. Mother objected to the proposed service plan. In support of her objection, Mother presented a February 2010 letter written by Dr. Albatosov, a psychiatrist with Care Hawaii, who had been treating Mother. Dr. Albatrosov stated that Mother had been reasonably stable over the past two years without taking any anti-psychotic medications and recommended that Mother continue close observation and individual therapy without the use of psychoactive medications. The Family Court amended the DHS's proposed service plan to omit the reference to the psychiatric medications as recommended by Dr. Yang, but included a requirement that Mother participate in a medication management program if recommended. The Family Court approved and ordered the service plan, as amended, in April 2010.

In preparation for a December 2010 review hearing, the Children's guardian ad litem (GAL) contacted Care Hawaii and learned that Dr. Albatrosov was no longer there and that his duties had been assumed by Nidhi Chabora, an advanced practice nurse with prescriptive rights. Nurse Chabora informed the DHS that Mother was very paranoid and had delusions of persecution. Nurse Chabora stated that without the assistance of medications, which Mother was refusing, Mother would present a danger to Children if they were reunited with Mother.

In August 2011, the DHS requested a hearing date on its motion to terminate Mother's parental rights. Mother requested the appointment of an independent medical examiner, and the Family Court appointed Samuel Paltin, D.O., M.D. In November 2011, the DHS filed a withdrawal of it motion to terminate Mother's parental rights and instead sought a guardianship for Children without the termination of Mother's parental rights. However, when Mother stated that she would not consent to the

4

proposed guardianship, the DHS renewed its motion to terminate Mother's parental rights.

Dr. Paltin testified at the hearing on the DHS's motion to terminate parental rights, and the report he prepared of his psychiatric evaluation of Mother was admitted in evidence. Dr. Patlin's diagnosis of Mother was schizophrenia, paranoid type, and alcohol/polysubstance abuse. Dr. Paltin noted that Mother's disorder is characterized by delusions and hallucinations, difficulty in formulating logical conclusions, and the inability to function adequately over a prolonged period. It was Dr. Paltin's belief that without the assistance of anti-psychotic medication, Mother would not be able to function as an adequate parent for her teenage children.

The Family Court terminated Mother's parental rights and approved and ordered the terms set forth in the permanent plans dated April 25, 2012.

## DISCUSSION

We resolve the arguments raised by Mother on appeal as follows:

### I.

We conclude that the Family Court did not err in terminating Mother's parental rights. The Family Court terminated Mother's parental rights pursuant to HRS § 587A-33 (Supp. 2012), which provides in relevant part:

> (a) At a termination of parental rights hearing, the court shall determine whether there exists clear and convincing evidence that:
>
> (1) A child's parent whose rights are subject to termination is not presently willing and able to provide the parent's child with a safe family home, even with the assistance of a service plan;
>
> (2) It is not reasonably foreseeable that the child's parent whose rights are subject to termination will become willing and able to provide the child with a safe family home, even with the assistance of a service plan, within a reasonable period of time, which shall not exceed two years from the child's date of entry into foster care;

5

(3)  The proposed permanent plan is in the best
     interests of the child.  In reaching this
     determination, the court shall:

     (A)  Presume that it is in the best interests
          of the child to be promptly and
          permanently placed with responsible and
          competent substitute parents and family in
          a safe and secure home; and

     (B)  Give greater weight to the presumption
          that the permanent plan is in the child's
          best interest, the younger the child is
          upon the child's date of entry into foster
          care; and

(4)  The child consents to the permanent plan if the
     child is at least fourteen years old, unless the
     court consults with the child in camera and
     finds that it is in the best interest of the
     child to proceed without the child's consent.

## A.

Mother contends that the Family Court erred in determining that Mother could not provide a safe family home.  We disagree.

As preconditions for the termination of Mother's parental rights, the Family Court was required to determine that (1) Mother was not presently willing and able to provide Children with a safe family home, and (2) it was not reasonably foreseeable that Mother would become willing and able to provide Children with a safe family home, within a reasonable period of time.  HRS § 587A-33(a)(1) and (a)(2).  We review the Family Court's determinations pursuant to HRS § 587A-33(a)(1) and (a)(2) as well as the Family Court's factual findings under the clearly erroneous standard of review.  In re Doe, 95 Hawai'i 183, 190, 20 P.3d 616, 623 (2001).

The Family Court made extensive factual findings concerning Mother's long history of mental illness and the negative effect it had on her Children, her behavior, and her ability to care for Children.  In addition, the Family Court found:

> 85.  While there is some conflict as to [M]other's
> diagnosis, there is general agreement and the court
> specifically finds that [M]other is actively psychotic and
> delusional.  Mother's delusions are paranoid, in the sense

that she perceives people around her are harming or threatening to harm her, exposing her to drugs against her will, or are talking about her. . . ;

86. Before they were removed from [M]other's home [Children] would hide in their closet or under their beds when [M]other was hallucinating or when she was delusional. They have been in foster custody for nearly seven and one-half years;

. . . .

93. Mother has completed many of the services set forth in the service plan, but has consistently denied that her mental health problems have harmed her children. Mother does not understand the severity of her mental health problems, and while she has at times engaged in therapy, she has steadfastly refused to take medication as part of her treatment. . . ;

94. Until it was determined that permanent out of home placement was in [Children's] best interests, DHS made reasonable efforts to reunify [M]other and [Children]. In addition to mental health treatment, [M]other was offered parenting classes and DHS provided for visits between [M]other and [Children]. When [Children] became reluctant to visit [M]other, DHS arranged for family therapy to address [Children's] concerns;

95. Throughout the history of this case [M]other has been unable or unwilling to address her mental illness, not even to the point of sustained unsupervised overnight visits with [Children], much less provide them a safe family home, even with the assistance of a service plan;

96. The court finds by clear and convincing evidence that [M]other is not presently willing and able to provide the children with a safe family home[], even with the assistance of a service plan;

97. The court finds by clear and convincing evidence that it is not reasonably foreseeable that mother will become willing and able to provide the children with a safe family home, even with the assistance of a service plan.

The Family Court considered and applied the safe family home factors set forth in HRS § 587A-7 (Supp. 2012) in determining that Mother was not willing and able to provide Children with a safe family home. The Family Court concluded:

6. Foremost among those factors in this case is [M]other's unwillingness and/or inability [to] understand the nature and severity of her mental illness. On account of that [M]other has not acknowledged and accepted responsibility for the harm she has caused [Children] [factor (8)], she has not demonstrated an understanding of and involvement in the services set forth in her service plan [factor (12)], she has not resolved the identified safety issues in her home despite seven years of DHS and court oversight [factor (13)];

7

7. Additionally, there is no protective non-perpetrator residing in the family home [factor (9)] nor a support system available to the family [factor (10)] to insure the safety of [Children] in [M]other's home;

8. The court has also considered DHS' assessment and recommendations, and the fact that [M]other has been unable to demonstrate over the seven plus years of this action her ability to provide a safe family home [factor (14)][.]

(brackets surrounding factor numbers in original).

We conclude that the Family Court's determinations that Mother was not presently willing and able, and it was not reasonably forseeable that Mother would become willing and able, to provide Children with a safe family home were supported by substantial evidence and were not clearly erroneous. Mother contends that there was no allegation that she would physically harm Children. However, providing a safe family home includes protecting Children against psychological and emotional harm. See HRS § 587A-7(a)(1)(B) (including as a safe family home factor, "[t]he child's developmental, psychological, medical, and dental health status and needs"); In re Doe, 95 Hawai'i at 194, 20 P.3d at 627 ("[A] safe family home is a family home in which the child's parents or legal custodian can adequately provide for the child's physical and psychological health and welfare and thereby adequately protect the child from harm, be it actual, imminent, or threatened."). There was substantial evidence that Mother's mental condition exposed Children to psychological and emotional harm and rendered her unable to provide them with a safe family home.

B.

Mother argues that the Family Court erred in determining that the permanent plans were in the best interests of Children. We disagree.

As to MK, the record shows that MK was fifteen years old when the Order Terminating Parental Rights was issued; that he had been in a stable placement since his removal from Mother's custody, was active and healthy, and had bonded with his foster parents; that MK's permanent plan called for him to remain in

this placement; and that he did not want to return to his Mother's home. We conclude that the Family Court did not err in determining that MK's permanent plan was in the best interests of MK.

The question is a closer one for AK, who was seventeen years old when the Order Terminating Parental Rights was issued. The record shows that AK had a difficult time while in foster care. AK was physically abused by a relative of former foster parents, and AK became pregnant while living in another foster home, and then miscarried. AK was placed in numerous foster homes and experienced emotional problems, including those related to dealing with the effects of Mother's mental illness and its effect on their relationship. AK's permanent plan called for AK to be placed in a guardianship.

Mother notes the difficulties experienced by AK while in foster care and contends that Mother, rather then the DHS, should hold the residual parental rights in the event of guardianship. On the other hand, the DHS argues that AK wanted Mother's parental rights to be terminated so AK could find permanent placement in a home; the Children's GAL felt that placement in the DHS's permanent custody was in Children's best interests; and that the permanent plan was necessary to end the state of limbo and instability in which AK had been living for the prior seven years.

"Generally, the 'family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion.'" In re Doe, 95 Hawai'i at 189, 20 P.3d at 622 (citation omitted). Under the circumstances presented, we cannot say that the Family Court abused its discretion in determining that AK's permanent plan was in the best interests of AK.

C.

Mother argues that the Family Court violated her due process rights "by requiring that she either take potentially dangerous psychotropic drugs or permanently lose her Children."

9

Mother's argument is based on the erroneous premise that the Family Court terminated her parental rights because she refused to take psychotropic medications. However, in its conclusions of law, the Family Court made clear that this premise was false. The Family Court stated:

> Mother's parental rights are terminated here not because of her refusal to include medication as part of her mental health treatment, but because the court has found by clear and convincing evidence that [M]other is unwilling or unable to provide the children with a safe family home and that the permanent plans proposed for [Children] are in their best interests[.]

Mother's parental rights were terminated because she was unable to provide Children with a safe family home. Her inability to provide Children with a safe family home was due to her mental illness and the effect it had on her reasoning and behavior. The Family Court did not force or compel Mother to take psychotropic medication. It was up to Mother to decide how to treat her mental illness so that it would not prevent her from providing Children with a safe family home. Mother chose to address her mental illness without taking psychotropic medication. If she had been successful in treating and controlling her mental illness in this fashion and became able to provide Children with a safe family home, the Family Court would not have terminated her parental rights. Unfortunately for Mother, the methods she chose to treat her mental illness did not render her able to provide a safe family home.

Mother does not cite any case holding that a parent's due process rights are violated under the circumstances presented in this case. Because the Family Court did not force Mother to take psychotropic medication, the cases cited by Mother concerning the due process requirements where individuals are compelled to take such medication against their will, and the findings necessary to justify such actions, are inapposite. We conclude that the Family Court did not violate Mother's due process rights.

10

II.

Mother alternatively argues that if the Family Court did not err in terminating her parental rights, then "the Family Court erred in failing to appoint a guardian ad litem for Mother in light of her repeated and consistent mental illness diagnosis." We disagree.

HRS § 587A-16(b)(2)(B) (Supp. 2012) provides in relevant part that the Family Court "may appoint a guardian ad litem for an adult party only after a determination, by clear and convincing evidence, that: (i) [t]he party is an incapacitated person; and (ii) [t]he party's identified needs cannot be met by less restrictive means, including the use of appropriate and reasonably available assistance." (format altered). The term "incapacitated person," in turn, is defined in relevant part to mean "a person who, even with appropriate and reasonably available assistance, is unable to substantially: (1) [c]omprehend the legal significance of the issues or nature of the proceedings under this chapter; (2) [c]onsult with counsel; and (3) [a]ssist in preparing the person's case or strategy." HRS § 587A-4 (Supp. 2012) (format altered).

Mother's counsel requested the appointment of a guardian ad litem for Mother. In considering this request, the Family Court explained to Mother that a guardian ad litem would talk to Mother and examine all the other available information and would "then tell the Court what he or she believes is best for you." The Family Court also explained that "the guardian ad litem's position might be different from yours[.]" Mother stated that she understood the Family Court's explanation and asserted that she did not want a guardian ad litem.

In denying the request for appointment of a guardian ad litem for Mother, the Family Court essentially found that Mother was not an "incapacitated person." The Family Court expressed its belief that Mother understood the proceedings in the courtroom and understood "the risks that you assume when you make certain decisions." The Family Court further stated that if it

11

was in Mother's position, "I probably make a different decision," but that was not enough for the court "to take away [Mother's] decision-making authority."

Although Mother's mental illness prevented her from providing Children with a safe family home, that did not necessarily mean that Mother was an incapacitated person whose needs could not be met by less restrictive means than the appointment of a guardian ad litem. Mother was represented by counsel in the proceedings to terminate her parental rights, and she opposed the termination of her parental rights as well as guardianship for her Children. We conclude that the Family Court did not abuse its discretion in respecting Mother's decision-making authority and declining to appoint a guardian ad litem for Mother.

CONCLUSION

We affirm the Family Court's Order Terminating Parental Rights.

DATED: Honolulu, Hawai'i, September 30, 2013.

On the briefs:

Rebecca A. Copeland
(Law Office of Rebecca
A. Copeland, LLC)
for Appellant-Mother

Kimberly Tsumoto Guidry
First Deputy Solicitor General
Department of the Attorney General
for State of Hawai'i, Department
of Human Services

Chief Judge

Associate Judge

Associate Judge